# UNITED STATES DISTRICT COURT

**EASTERN**   DISTRICT OF   **CALIFORNIA**

—oOo—

# FILED

NOV 2 0 2012

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

### UNITED STATES OF AMERICA

**v.**

### GERALD J. RATULOWSKI



## CRIMINAL COMPLAINT

CASE NUMBER: 2:12·mj·0313 KJN

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. In Sacramento County, in the Eastern District of California defendant did,

- **between on or about June 13, 2012, and on or about September 3, 2012, did knowingly receive and distribute visual depictions using a means and facility of interstate and foreign commerce, and that had been transported in and affecting interstate and foreign commerce, and which contained materials which had been so transported, by any means, including by computer, where the production of such visual depictions involved the use of a minor engaging in sexually explicit conduct and such visual depictions were of such conduct as defined in Title 18, United States Code, Section 2256(2); and ,**

- **on or about October 9, 2012, did knowingly possess and knowingly access with intent to view, matter which contained visual depictions that had been transported using a means and facility of interstate and foreign commerce, and in and affecting interstate and foreign commerce, and which was produced using materials which had been so transported, by any means, including by computer, where the production of such visual depictions involved the use of a minor engaged in sexually explicit conduct and such visual depictions were of such conduct, as defined in Title 18, United States Code, Section 2256(2);**

in violation of **Title 18, United States Code, Section(s) 2252(a)(2) and (a)(4)(B)**, respectively. I further state that I am a Special Deputy United States Marshal, assigned to the Sacramento Internet Crimes Against Children Task Force, and that this complaint is based on the following facts:

- **See Attached Affidavit**

**X** Continued on the attached sheet and made a part hereof.

_____
Signature of Complainant JAMES WILLIAMS
Special Deputy U.S. Marshal
Sacramento ICAC Task Force

Sworn to before me, and subscribed in my presence

November 19, 2012

Date

at   Sacramento, California

City and State

KENDALL J. NEWMAN

United States Magistrate Judge

Name and Title of Judicial Officer

_____
Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, James Williams, being duly sworn, depose and state:

1. I am a Detective with the Sacramento County Sheriff's Department (SSD), presently assigned to the Sacramento Internet Crimes Against Children (ICAC) Task Force. I have been assigned to the Sacramento ICAC Task Force since August 2001. I have been employed by the SSD since April 1991. In August 2006, I was cross designated as a Special Deputy United States Marshal. As part of my daily duties as a Detective, I investigate criminal violations relating to child exploitation and child pornography including violations pertaining to the illegal production, distribution, receipt and possession of child pornography, in violation of 18 U.S.C. §§ 2251 and 2252. I have received training in the area of child pornography and child exploitation and as part of my duties have observed and reviewed numerous examples of child pornography and visual depictions of minors engaged in sexually explicit conduct (as defined in 18 U.S.C. § 2256) in all forms of media, including computer media. I have attended numerous courses in the investigation of child sexual exploitation, child pornography, and online child sexual exploitation. In the course of my duties I have been the investigating officer and Affiant of over 100 applications for search warrants relating to numerous child pornography investigations.

2. I also have provided instruction to both law enforcement and civilians in the area of Internet security, online child exploitation, as well as social networking sites, such as MySpace and Facebook. I have received extensive training in the areas of computers and computer forensics, and I am considered a subject matter expert in high technology crimes and child exploitation. I have certifications from the Robert Presley Institute of Criminal Investigation in the investigation of High Technology Crimes. As a subject matter expert, I have assisted with the development of California Peace Officer Standards and Training (POST) telecourses for these subjects. I have also written and distributed, nationwide, several papers in regards to investigations of Peer to Peer (P2P) file-sharing investigations.

3. This Affidavit is made in support of an application for an arrest warrant for GERALD J. RATULOWSKI, date of birth May 13, 1945, currently residing at 8748 Redwater Drive, Antelope, CA 95843 (hereinafter "SUBJECT").

4. I believe that there is probable cause to believe that the SUBJECT has violated 18 U.S.C. § 2252 (a) (4) (B), which makes it a crime to knowingly possess matter containing any visual depiction that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct, and such visual depiction was of such conduct; 18 U.S.C. §§ 2252 (a) (2), which makes it a crime to knowingly receive or distribute any visual depiction using any means or facility of interstate or foreign commerce, or that has been mailed, or shipped or transported in or affecting interstate or foreign commerce, or which contains materials which have been mailed, shipped or transported in interstate or foreign commerce, by any means including by computer, where the producing of such visual depiction involved the use of a minor engaging in sexually explicit conduct, and such visual depiction was of such conduct.

5. I am familiar with the information contained in this Affidavit based upon my experience and training, my conversations with other law enforcement officers who have engaged in numerous investigations involving child pornography, and the investigation I have conducted.

6. Because this Affidavit is being submitted for the limited purpose of securing an arrest warrant, I have not included each and every fact known to me concerning this investigation. I have not excluded any significant exculpatory evidence. I have set forth only those facts that I believe are necessary to establish probable cause to believe that the SUBJECT has violated 18 U.S.C. § 2252. Where statements of others are set forth in this Affidavit, they are set forth in substance and in part.

/////

/////

12-210822
305A-SC-2496946

**Definitions**

7. "Child Pornography" includes the definition found at 18 U.S.C. § 2256(8), and is any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

8. As used in this affidavit, "child erotica" means materials or items that are sexually arousing to certain individuals but that are not in and of themselves obscene or do not necessarily depict minors in sexually explicit poses or positions. Such material may include non-sexually explicit photographs (such as minors depicted in undergarments in department store catalogs or advertising circulars), drawings, or sketches, written descriptions/stories, or journals.

9. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

10. "Minor" means any person under the age of eighteen years. See 18 U.S.C. § 2256(1).

11. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, genital-anal, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. See 18 U.S.C. § 2256(2).

**The Internet and Definitions of Technical Terms Pertaining to Computers**

12. As part of my training, I have become familiar with the Internet (also commonly known as the World Wide Web), which is a global network of computers[1] and other electronic devices that communicate with each other using various means, including

---

[1] The term "computer" is defined by 18 U.S.C. § 1030 (e) (1) to mean "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device."

12-210822
305A-SC-2496946

standard telephone lines, high-speed telecommunications links (e.g., copper and fiber optic cable), and wireless transmissions including satellite. Due to the structure of the Internet, connections between computers on the Internet routinely cross state and international borders, even when the computers communicating with each other are in the same state. Individuals and entities use the Internet to gain access to a wide variety of information; to send information to, and receive information from, other individuals; to conduct commercial transactions; and to communicate via electronic mail ("e-mail"). An individual who wants to use Internet e-mail must first obtain an account with a computer that is linked to the Internet (through a university, an employer, or a commercial service such as an "Internet Service Provider" or "ISP" [see definition of "Internet Service Provider" below]). Once the individual has accessed the Internet, that individual can use Internet mail services, including sending and receiving e-mail. In addition, the individual can visit web sites (see definition of "web sites" below), and make purchases on the web sites.

13. Set forth below are some definitions of technical terms, used throughout this Affidavit, and in Attachments A, B, and C, hereto, pertaining to the Internet and computers more generally.

    a.  Client/Server Computing:  Computers on the Internet are identified by the type of function they perform. A computer that provides resources for other computers on the Internet is known as a server.  Servers are known by the types of service they provide; that is, how they are configured. For example, a web server is a machine that is configured to provide web pages to other computers requesting them. A client computer is a computer on the Internet that is configured to request information from a server configured to perform a particular function. For example, if a computer is configured to browse web pages and has web page browsing software installed, it is considered a web client.

    b.  Computer system and related peripherals, and computer media: As used in this Affidavit, the terms "computer system and related peripherals, and computer media" refer to tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer

printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drives and other computer-related operation equipment, digital cameras, scanners, in addition to computer photographs, and other visual depictions of such Graphic Interchange formats, including but not limited to, JPG, GIF, TIF, AVI, and MPEG.

c. Digital device: includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes, and memory chips; and security devices.

d. Domain Name: Domain names are common, easy to remember names associated with an Internet Protocol address (defined below). For example, a domain name of "www.usdoj.gov" refers to the Internet Protocol address of 149.101.1.32.

e. Hash value: A mathematical algorithm generated against data to produce a numeric value that is representative of that data. A hash value may be run on media to find the precise data from which the value was generated. Hash values cannot be used to find other data.

f. Image or copy: An accurate reproduction of information contained on an original physical item, independent of the electronic storage device. "Imaging" or "copying" maintains contents, but attributes may change during the reproduction.

g. Internet Service Providers (ISPs) and the Storage of ISP Records: Internet Service Providers are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of

functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, that the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and personal password. ISPs maintain records ("ISP records") pertaining to their subscribers (regardless of whether those subscribers are individuals or entities). These records may include account application information, subscriber and billing information, account access information (often times in the form of log files), e-mail communications, information concerning content uploaded and/or stored on or via the ISP's servers, and other information, which may be stored both in computer data format and in written or printed record format. ISPs reserve and/or maintain computer disk storage space on their computer system for their subscribers' use. This service by ISPs allows for both temporary and long-term storage of electronic communications and many other types of electronic data and files. Typically, e-mail that has not been opened by an ISP customer is stored temporarily by an ISP incident to the transmission of that e-mail to the intended recipient, usually within an area known as the home directory. Such temporary, incidental storage is defined by statute as "electronic storage." See 18 U.S.C. § 2510 (15). A service provider that is available to the public and provides storage facilities after an electronic communication has been transmitted and opened by the recipient, or provides other long-term storage

services to the public for electronic data and files, is defined by statute as providing a "remote computing service." See 18 U.S.C. § 2711(2).

h. Internet Protocol Address (IP address): Every computer or device on the Internet is referenced by a unique Internet Protocol address the same way every telephone has a unique telephone number. An IP address is a series of four numbers separated by a period, and each number is a whole number between 0 and 254. An example of an IP address is 192.168.10.102. Each time an individual accesses the Internet the computer from which that individual initiates access is assigned an IP address. A central authority provides each ISP a limited block of IP addresses for use by that ISP's customers or subscribers. Most ISP's employ dynamic IP addressing, that is they allocate any unused IP addresses at the time of initiation of an Internet session each time a customer or subscriber accesses the Internet. A dynamic IP address is reserved by an ISP to be shared among a group of computers over a period of time. The ISP logs the date, time, and duration of the Internet session for each IP address and can identify the user of that IP address for such a session from these records. Typically, users who sporadically access the Internet via a dial-up modem will be assigned an IP address from a pool of IP addresses for the duration of each dial up session. Once the session ends, the IP address is available for the next dial up customer. On the other hand, some ISP's, including most cable providers, employ static IP addressing, that is a customer or subscriber's computer is assigned one IP address that is used to identify each and every Internet session initiated through that computer. In other words, a static IP address is an IP address that does not change over a period of time and is typically assigned to a specific computer.

i. Uniform Resource Locator (URL): The address of a resource or file located on the Internet, also called a "domain name".

j. Web site Hosting: Web site hosting provides the equipment and services required to host and maintain files for one or more web sites and to provide rapid Internet connections to those web sites. Most hosting is "shared," which means that multiple web sites of unrelated companies are on the same server

in order to reduce associated costs. When a client develops a Web site, the client needs a server and perhaps a web hosting company to host it. "Dedicated hosting" means that the web hosting company provides all of the equipment and assumes all of the responsibility for technical support and maintenance of a Web site. "Co-location" means a server is located at a dedicated hosting facility designed with special resources, such as a secure cage, regulated power, a dedicated Internet connection, online security and online technical support. Co-location facilities offer customers a secure place to physically house their hardware and equipment as opposed to keeping it in their offices or warehouses, where the potential for fire, theft, or vandalism is greater.

## Computers and Child Pornography

14. Based upon my knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, computers and computer technology have revolutionized the way in which child pornography is produced, distributed and utilized. Prior to the advent of computers and the Internet, child pornography was produced using cameras and film, resulting in either still photographs or movies. The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. As a result, there were definable costs involved with the production of pornographic images. To distribute these images on any scale also required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contacts, mailings, and telephone calls, and compensation for these wares would follow the same paths. More recently, through the use of computers and the Internet, distributors of child pornography use membership-based/subscription-based web sites to conduct business, allowing them to remain relatively anonymous.

15. In addition, based upon my own knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of

other law enforcement officers with whom I have had discussions, the development of computers has also revolutionized the way in which child pornography collectors interact with, and sexually exploit, children. Computers serve four basic functions in connection with child pornography: production, communication and distribution, and storage. More specifically, the development of computers has changed the methods used by child pornography collectors in these ways:

a. Production: Producers of child pornography can now produce both still and moving images directly from a common video or digital camera. The camera is attached, using a device such as a cable, or digital images are often uploaded from the camera's memory card, directly to the computer. Images can then be stored, manipulated, transferred, or printed directly from the computer. Images can be edited in ways similar to how a photograph may be altered. Images can be lightened, darkened, cropped, or otherwise manipulated. The producers of child pornography can also use a device known as a scanner to transfer photographs into a computer-readable format. As a result of this technology, it is relatively inexpensive and technically easy to produce, store, and distribute child pornography. In addition, there is an added benefit to the pornographer in that this method of production does not leave as large a trail for law enforcement to follow.

b. Communication and Distribution: The Internet allows any computer to connect to another computer. By connecting to a host computer, electronic contact can be made to literally millions of computers around the world. In addition, the Internet allows users, while still maintaining anonymity, to easily locate (i) other individuals with similar interests in child pornography; and (ii) web sites that offer images of child pornography. Child pornography collectors can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with each other and to distribute child pornography. These communication links allow contacts around the world as easily as calling next door. Additionally, these communications can be quick, relatively secure, and as anonymous as desired. All of these advantages, which promote anonymity for both the distributor and

recipient, are well known and are the foundation of transactions between child pornography collectors over the Internet. Sometimes the only way to identify both parties and verify the transportation of child pornography over the Internet is to examine the recipient's computer, including the Internet history and cache[2] to look for "footprints" of the web sites and images accessed by the recipient.

c. Storage: The computer's capability to store images in digital form makes it an ideal repository for child pornography. A single floppy disk can store dozens of images and hundreds of pages of text. The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Hard drives with the capacity of 80 gigabytes are not uncommon. These drives can store thousands of images at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with a video capture board, and save that image to storage in another country. Once this is done, there is no readily apparent evidence at the "scene of the crime." Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

## Overview of Peer-to-Peer Child Pornography Investigation; Terms, Background and Methodology:

16. In October 2005 your Affiant and ICAC Task Force Agents began working an Internet undercover operation to identify persons using P2P software on the Internet to traffic in child pornography. Your Affiant knows from training and experience that peer-to-peer networks, are frequently used to trade child pornography.

17. While examining P2P file-sharing networks your Affiant learned that computer users can chose to install publicly available software that facilitates the trading of images. The software, when installed, allows the user to search for pictures, movies and other

---

[2] "Cache" refers to text, image and graphic files sent to and temporarily stored by a user's computer from a web site accessed by the user in order to allow the user speedier access to and interaction with that web site.
12-210822
305A-SC-2496946

digital files by entering text as search terms. That text search is sent to an ultra-peer. An ultra-peer is an index server that handles requests and examines submitted file lists from peers that it knows about for files matching the text search request. A file list is then sent back to the requesting user who can choose to download files from peers who possess at least a portion of the file.

18. Search results presented to the user allow the user to select a file and then receive that file from other users around the world. These users can receive the selected file from numerous sources at once. The software can balance the network load and recover from network failures by accepting pieces of the file from different users and then reassembling the file on the local computer.

19. Peer to peer networks can only succeed in reassembling the file from different parts if the parts all come from the same original file. Your Affiant knows that multiple persons sharing one file can deliver different pieces of that file to the local software and the local software can insure that a complete and exact copy can be made from the parts. Your Affiant has been able to confirm from use of the software that different copies of the same file can be named differently.

20. Even though the peer to peer networks links together computers all over the world and users can download files, it is not possible for one user to send or upload a file to another user of the P2P network. The software is designed only to allow files to be downloaded that have been selected. One does not have the ability to send files from his/her computer to another user's computer without their permission or knowledge. Therefore, it is not possible for one user to send or upload child pornography files to another user's computer without his/her active participation.

21. Peer to peer computer software has different methods to insure that two files are exactly the same. Your Affiant knows from training and experience that the method used by the P2P operation described herein involves a compressed digital representation method called Secure Hash Algorithm Version 1 or SHA1. Your Affiant knows that the Secure Hash Algorithm (SHA) was developed by the National Institute of Standards and Technology (NIST), along with the National Security Agency (NSA), for use with the Digital Signature Standard (DSS) as specified within

the Secure Hash Standard (SHS). The United States of America has adopted the SHA1 hash algorithm described herein as a Federal Information Processing Standard.

22. Digital files can be processed by this SHA1 standard resulting in a digital signature. By comparing these signatures your Affiant can conclude that two files are or are not identical with a precision that greatly exceeds 99.9999 percent certainty. Your Affiant knows through the computer forensic community that there has never been a documented occurrence of two different files being found on the Internet having different contents while sharing the same SHA1 value.

23. The use of SHA1 compressed digital representations for the matching of movies and images has proven to be extremely reliable. Through this method of comparison your Affiant has matched thousands of files and has never found two files with different contents but the same SHA1 value.

24. The P2P network investigated in this operation uses the SHA1 digital signature to verify the unique identity of individual files. Your Affiant knows that users attempting to trade files on a P2P file-sharing network can place files from their local computer into a shared file directory. If that user then starts the P2P software, that local computer calculates the SHA1 signature for each shared file and provides that information to other users wishing to trade files.

25. Entering search terms in the P2P software results in a list of SHA1 digital signatures that your Affiant can choose for download. By using this type of search your Affiant compares the offered SHA1 signatures with SHA1 signatures known to belong to movies or images of child pornography. Your Affiant confirms these SHA1 values as belonging to child pornography by examining the files from previous investigations with the matching SHA1 value. By watching these movies or viewing these images your Affiant is able to determine the exact file referenced by the given SHA1 value. Once a matching set of digital signatures is identified, your Affiant submits a download request for the file.

26. This method has proven to be extremely reliable, working just like software used by end users around the world in locating and downloading precise files. Once the download of child pornography is initiated, your Affiant receives a list of download candidates who are participating in the possession, receipt and/or distribution of child

pornography. This feature allows your Affiant to conduct undercover operations that involve images of child sexual abuse being traded on peer-to-peer networks.

27. Internet computers identify each other by an Internet Protocol or IP address. Your Affiant knows that these IP addresses can assist law enforcement in finding a particular computer on the Internet. These IP addresses lead the law enforcement officer to a particular ISP or company. Given the date and time the IP address was used, an ISP can typically identify the account holder by name and physical address.

28. Your Affiant learned that searching on a peer-to-peer network as described above results in your Affiant receiving a list of IP addresses identifying locations where a computer has P2P software installed and individual files have been reported as available for download with a specific digital signature (SHA1). These computers are referred to as download candidates. A download candidate is a computer that was reported by an ultra-peer as a source for the file listed by SHA1 value. In almost every known case, the download candidate serves those files to P2P users across the Internet. Computers from throughout the world can download files from download candidates without regard to geographic location. Files located on P2P download candidates are quickly available throughout the world due to the distributed sharing model of P2P networks.

29. Peer to peer software may display the Globally Unique Identifier (GUID) identification number of computers offering to share files on the network. A Globally Unique Identifier or GUID is a pseudo-random number used in software applications. This GUID number is produced when some P2P software applications are installed on a computer. While each generated GUID is not guaranteed to be unique, the total number of unique keys is so large that the probability of the same number being generated twice is very small. When comparing these GUIDs, your Affiant can quickly determine with a high degree of certainty that two different IP addresses that are associated with the same GUID are associated with the same computer. Should the computer be used to access the internet from a different IP address the GUID will remain the same as it is intrinsic to the computer system. Further, should the user of the computer update the file-sharing program with a newer version, a new GUID will be assigned to the computer for the updated program.

30. Cooperating police agencies pool their information to assist in identifying criminal conduct and build probable cause to further criminal investigations. With this pooled information police get a better understanding of the global information available about a suspect who resides in their area of jurisdiction. This information is valuable when trying to regionalize a suspect to a certain jurisdiction, given the global scope of the Internet. Investigators from around the world gather and log information, which can be used by an investigator to build probable cause on one specific case.

31. By examining a list of IP addresses your Affiant can locate computers that are reported to be in California. By comparison of the SHA1 digital signatures your Affiant can conclude that a computer, originating from an IP address known to be in California, has P2P software installed on it and contains images of child pornography. With this information a request can be made to the Internet service provider to identify the specific physical address related to the use of P2P software in the exchange of child pornography.

32. Your Affiant is aware that over 300 search warrants have been executed in the State of California by using the above method of investigation. This method has proven to be extremely reliable in determining the location of computers that were involved in the P2P-facilitated trading of child pornography. Your Affiant has been involved in many of those search warrants either as the primary investigator, or assisting other investigators with their warrants. By using the above listed method of investigation, nearly every case was verified through the following means:

   a. Evidence of child pornography was found on the computer;

   b. If no images of child pornography were found on the computer, interviews of persons using those computers verified that child pornography had been present at one time but had been deleted or the computer with the child pornography had been removed from the premises; or

   c. Evidence was found showing that images of child pornography were moved from the computer and stored on other media.

/////

/////

12-210822
305A-SC-2496946

**Ares Network**

33. The Ares network is a P2P file-sharing network.  Users of this network can simultaneously provide files to users while downloading files from other users. The Ares network can be accessed by computers running several different client programs.  These programs share common protocols for network access and file-sharing.  The user interface, features, and configuration may vary between clients, and between versions of the same client.

34. During the installation of an Ares client, various settings are established which configure the host computer to share files. Depending upon the Ares client used, a user may have the ability to reconfigure some of those settings during installation or after the installation has been completed. Typically, a setting establishes the location of one or more directories or folders whose contents (files) are made available to other Ares users to download. This location is commonly referred to as the "My Shared Folder."  In many versions the default location for this folder is on the computer's "Desktop."

35. The client software processes files located in a user's shared directory. As part of this processing, a SHA1 hash value is computed for each file in the user's shared directory. The client software processes files located in a peer's shared directory. As part of this processing, a SHA1 hash value is loaded from a prior record or computed for each file in the user's shared directory.

36. The Ares network uses SHA1 values to improve network efficiency. Users may receive a selected file from numerous sources by accepting segments of the file from multiple users and then reassembling the complete file on the local computer. The client program succeeds in reassembling the file from different sources only if all the segments came from exact copies of the same file. The network uses SHA1 values to ensure exact copies of the same file are used during this process.

37. Upon connecting to the Ares network, a list of shared files, descriptive information and the files associated SHA1 values are sent to supernodes. This allows other users to locate these files. The frequency of updating information is dependent upon the client software being used and the Ares networking protocols. This information sent to the supernodes is

data about the file and not the actual file. The file remains on the user's computer. In this capacity, the supernode acts as a pointer to the files located on a user's computer.

38. When a download of a file is initiated, the user is presented with a list of users (nodes) who had told the Ares network that they have the requested file available for others to download. Typically, the supernodes and hosts computers on the network return this list containing node information and the IP addresses of computers which have reported they have the same file (based on SHA1 comparison), or in some instances portions of the same file available to others to download. This procedure allows for the detection and investigation of those computers involved in sharing digital files of known actual child pornography.

39. Obtaining files from the Ares network, as described herein, returns the candidate list, including IP addresses, which can be used to identify the location of computers. Although the IP address is not usually visible to the end user in the common Ares clients, it is returned and used by the software to initiate the download.

40. Law enforcement has modified the Ares program to allow the downloading of a file from a single IP address as well as displaying the IP address which, as explained above, is known to all Ares clients but usually not displayed.


**Probable Cause to Arrest the SUBJECT:**

41. On June 13, 2012, at 2025 PM (PDT), I was conducting investigations into the sharing of suspected child pornography files on the Ares P2P file-sharing network. At this time, I identified a computer with the IP address 71.197.84.97 as a potential download candidate (source) for at least 13 files of investigative interest. I directed my investigation to this computer at IP address 71.197.84.97 as it had been recently identified as a possible source of child pornography by investigators conducting keyword searches or hash value searches on the Ares network for files related to child abuse material, including child pornography.

42. During the investigation of the computer using IP address 71.197.84.97, the Ares client reported its version as 2.1.8.3042. This client also reported its Ares nickname as "anon_47c55461@Ares."

43. On June 13, 2012, between 2018 hours and 2026 hours (PDT), I successfully completed the download of the following file of child pornography that the computer at IP address 71.197.84.97 was making available:

| (g g g) stickam 2009 jullie 3 ten yr olds ++++.avi | V5FRMMM6MVJUQ5EJXZO4ZM7A3NJYPLG7 |
|---|---|

This is a color video, approximately 17 minutes and 25 seconds in length that appears to have been created with a webcam. The video starts with three prepubescent girls who are clothed sitting in front of the camera. Two of the girls appear to only be wearing a bra and the other prepubescent girl appears to be clothed. Then this girl removes her shirt. All three of the girls do not appear to be older than 10 years of age. The girls pull up their bra and expose their nipples occasionally and then later step out of camera view and return exposing their buttocks. Later in the video, the girls expose their genital area to the camera view.

This file (like all the files described herein), was downloaded using the modified law enforcement version of Ares. As such, they were downloaded from a single IP address.

44. On June 13, 2012, a DNS check on the IP address 71.197.84.97 was conducted through the American Registry for Internet Numbers (ARIN). I received information that the IP address 71.197.84.97 is registered to Comcast Cable Communications, Inc.

45. On August 20, 2012, at 6:45 PM (PDT), I was conducting investigations into the sharing of suspected child pornography files on the Ares P2P file-sharing network. At this time, I identified a computer with the IP address 71.197.84.97 as a potential download candidate (source) for at least 43 files of investigative interest.

46. During the investigation of the computer using the Ares client P2P program, the Ares client reported its version as 2.1.8.3042. This client also reported its Ares nickname as anon_47c55461@Ares.

/////

/////

/////

47. On August 20, 2012, between 1650 hours and 1845 hours (PDT), I successfully downloaded the following file of child pornography that the computer at IP address 71.197.84.97 was making available:

| (g g g) stickam 2009 jullie 3 ten yr olds ++++.avi | V5FRMMM6MVJUQ5EJXZO4ZM7A3NJYPLG7 |
|---|---|

This is a color video, approximately 17 minutes and 25 seconds in length that appears to have been created with a webcam. The video starts with three prepubescent girls who are clothed sitting in front of the camera. Two of the girls appear to only be wearing a bra and the other prepubescent girl appears to be clothed. Then this girl removes her shirt. All three of the girls do not appear to be older than 10 years of age. The girls pull up their bra and expose their nipples occasionally and then later step out of camera view and return exposing their buttocks. Later in the video, the girls expose their genital area to the camera view.

This appeared to be the same video that I had downloaded on June 13, 2012.

48. On August 20, 2012, a DNS check on the IP address 71.197.84.97 was conducted through ARIN. I received information that the IP address 71.197.84.97 is registered to Comcast Cable Communications, Inc.

49. On September 2, 2012, at 12:01 AM (PDT), I was conducting investigations into the sharing of suspected child pornography files on the Ares P2P file-sharing network. At this time, I identified a computer with the IP address 71.197.84.97 as a potential download candidate (source) for at least 74 files of investigative interest.

50. During the investigation of the computer using the Ares client P2P program, the Ares client reported its version as 2.1.7.3041. This client also reported its Ares nickname as "anon_47c55461@Ares."

51. Between September 01, 2012 at 2312 hours and September 02, 2012 at 0145 hours (PDT), I successfully downloaded of the following files that the computer at IP address 71.197.84.97 was making available:

/////

/////

/////

12-210822
305A-SC-2496946

| (pthc) jho-special edition.avi | VAIC5IVY6WRBUXBZXL7QJFK66SJEF2MG |
| --- | --- |

This was a color video, approximately 11 minutes and 37 seconds in length that begins with a nude male laying down on a bed with a clothed prepubescent girl. The male has the prepubescent girl sit on top of him and begins to undress her. The adult male has prepubescent girl straddle him and rubs his penis on her genital area as he is rubbing the child's buttocks. The adult male then has the child lay on her back and rubs his erect penis on her genital area.

| #(pthc lolifuck) kimmy - !!!new!!! st petersburg (i06)(pthc).avi | 4ZG5CIPDGB5X4SX23WY5MCHFATQ7RSPU |
| --- | --- |

This was a color video, approximately 7 minutes and 13 seconds in length. The video starts with a prepubescent girl who is sitting on a bed and then an adult male wearing only underwear walks into the camera view. The prepubescent girl removes his underwear and begins to masturbate the adult male and then orally copulates him. The adult male removes the girl's shirt as she continues to masturbate and orally copulate him until the male ejaculates.

52. On September 02, 2012 a DNS check on the IP address 71.197.84.97 was conducted through the American Registry for Internet Numbers (ARIN). I received information that the IP address 71.197.84.97 is registered to Comcast Cable Communications, Inc.

53. On Sunday, September 02, 2012, between 0340 hours and 0410 hours, I successfully completed the download of the following 1 file that the computer at IP address 71.197.84.97 was making available:

| (((kingpass))) new!! pthc fuckingslut (new k-girl) 1.mpg | 65EP42MUTX3ED23IF3YPTA6BHEB3DBPQ |
| --- | --- |

This was a color video, approximately 7 minutes and 32 seconds in length, with a caption that said "www.videoangels.com" in the bottom right corner. It showed a prepubescent girl who dancing and undressing as she danced. The girl would undress until she was naked and oftentimes her genital area would be exposed to the camera.

*These file(s) were downloaded only from the computer at IP Address **71.197.84.97**.*

54. On September 02, 2012, between 0453 hours and 0525 hours, I successfully downloaded the following 2 files that the computer at IP address 71.197.84.97 was making available:

/////

| (pthc-jho-lolifuck) 10 yo katrina - pussy cumshot (sound).wmv | 7FYE3TN6MHUFNVRQJULHB6YNZIK2ENCX |
|---|---|

This was a color video, approximately 16 seconds in length, that shows a nude adult male who is masturbating while laying next to a nude prepubescent girl. The camera is focused on the genital areas of both people and the male masturbates and rubs the genital area of the girl until the adult male ejaculates onto the girl's leg and genital area.

| (pthc) 9 yo (que buceta linda).mpg | 3BKETV34JCTB47S733MSACOQUWQGMZXS |
|---|---|

This is a color video, approximately 1 minute and 37 seconds in length that shows a close up view of a prepubescent girl's genital area. The girl appears to be outdoors and there are other people in the distance who are walking around naked. The video cuts to a scene where the prepubescent girl is sitting on the back of another nude person who is on his hands and knees and rocks her off of his back.

55. On September 2, 2012, at 4:05 PM (PDT), I was conducting investigations into the sharing of suspected child pornography files on the Ares P2P file-sharing network. At this time, I identified a computer with the IP address 71.197.84.97 as a potential download candidate (source) for at least 83 files of investigative interest.

56. During the investigation the Ares client P2P program on the computer with the IP address 71.197.84.97, reported its version as 2.1.7.3041. This client program also reported its ARES nickname as anon_47c55461@Ares.

57. On September 02, 2012, between 2049 hours and 2129 hours (PDT), I successfully downloaded the following file that the computer at IP address 71.197.84.97 was making available:

/////

/////

/////

/////

/////

/////

/////

/////

| toddler girl 3-way fuck.mpg | NCT2YXWBTYJKKIZ3RRVYOKDJRJT3ARWN |
|---|---|

This video file is approximately 2 minutes and 7 seconds in length and the video depicts a white adult female lying face up on a bed, and dressed in lingere with duct tape on her ankles while her legs are spread apart. There is a pre-pubescent naked girl (who appears to be under the age of 8) standing at the foot of the bed and she has duct tape covering her mouth. There is a naked adult male standing near the feet of the adult female and he is seen repetitively inserting the prepubescent girl's right arm into the vaginal area of the adult female. As the video progresses, the adult male moves up to the head of the adult female and is inserting his penis into the mouth of the adult female, who is blindfolded. Later the child is then moved by the adult male who places the child's genital area on top of the adult female's face. Near the end of the video, the scene changes to the floor where it appears that the adult male is attempted to penetrate the prepubescent girl, who is lying underneath the male.

58. On September 03, 2012, between 0702 hours and 0804 hours (PDT), I successfully downloaded the following 2 files that the computer at IP address 71.197.84.97 was making available:

| $rf(2).mpg | I3PH475R562VX3BFRJBHXE47KH7ORGQX |
|---|---|

This is a black and white video, which shows a prepubescent girl laying on her back with her legs spread. An adult male is masturbating while he is touching the female's genital areas and is penetrating her with his fingers. The male then attempts to penetrate the prepubescent girl with his erect penis.

| (pthc) webcam - 11y reili 20041104 01 (((kingpass))).avi | 6K6TIXMZVN6PEHPK5NZJJIE4AHHBOBIP |
|---|---|

This is a color video, approximately 11 minutes and 18 seconds in length. The video starts with a title screen which says "Reili Age: 11 Length 11m18s Captured: 11-4-2004". The video then shows a prepubescent girl's face and appears to have been captured by a webcam. The girl moves back and lifts her shirt, to expose her breast area. The video progresses and the girl stands up and pulls down her panties to expose her genital area. This occurs several times throughout the video.

59. On September 12, 2012 , I sent an administrative subpoena to Comcast Cable requesting the subscriber information for the IP address 71.197.84.97 on the dates and times identified above in which a computer at this IP address was observed offering files of suspected child pornography.

12-210822
305A-SC-2496946

60. On September 18, 2012, I received the requested information from Comcast Cable and saw that the subscriber information was:

> Gerald J. Ratulowski
> 8748 Redwater Drive
> Antelope, CA 95843
> 916-xxx-6434

61. A public records check on the address 8748 Redwater Drive, Antelope, CA 95843 showed the following people as listing that address:

    a. Gerald J. Ratulowski, date of birth April 13, 1945

    b. Jimmy S. Ratulowski, September 5, 1991

    c. Gerald J. Ratulowski, October 24, 1984

62. A check of California Department of Motor Vehicles (DMV) records showed that Gerald J. Ratulowski, Jimmy S. Ratulowski and Gerald J. Ratulowski (Jr), had each listed their residences as 8748 Redwater Drive, Antelope, CA 95843.

63. Jimmy S. Ratulowski had been arrested by the Twin Rivers School District Police for trespassing in 2011 but no charges were filed. This arrest also listed the Redwater address as his residence address.

64. I obtained a description and photographs of the residence. While I was obtaining the description, I checked the area around the residence for wireless signals and saw that all of the detectable wireless routers were secured.

65. I also observed a gold Ford Taurus station wagon parked in the driveway, with a California license plate of 4HYY766. A check of DMV records showed that this vehicle was registered to Gerald Ratulowski, 8748 Redwater Drive, Antelope, CA 95843.

66. A customer information request was sent to SMUD for the residence 8748 Redwater Drive, Antelope, CA 95843. SMUD identified the customer as Elsa M. Ratulowski, with a service start date of March 14, 2001.

67. On October 1, 2012, your Affiant obtained a search warrant for the SUBJECT's residence from Magistrate Judge Carolyn K. Delaney. This search was executed on October 9, 2012.

68. During the search of the SUBJECT's residence, law enforcement identified a desktop computer connected to the internet and running was found in the SUBJECT residence garage. On the screen at the time of the search was a webpage with video options. A second computer was located on the floor of the garage. A forensic preview was performed on both computers. Files of child pornography were located on both computers. Also located during the search was a spindle of compact disks (CDs). Located on the CDs were files of child pornography.

69. The SUBJECT was advised of his rights under Miranda. The SUBJECT initially denied any involvement in child pornography and the interview was ended. The SUBJECT was then asked to speak with investigators a second time. During this second interview, the SUBJECT admitted to using Ares to download files of child pornography. He also admitted to going to video-sharing websites like Stickam.com and watching videos of underage girls displaying their genitals in a sexual manner. The SUBJECT referred to himself as a "lurker," that is, someone who entered video-sharing sites and simply watched. This was contrasted with others who would enter the sites and interact with the underage females.

70. On November 15, 2012, I asked to meet with the SUBJECT a second time. The SUBJECT agreed and a meeting was set up for November 19, 2012.

71. On November 19, 2012, I met with the SUBJECT. During this meeting, the SUBJECT agreed to take a polygraph examination. The SUBJECT signed a consent form agreeing to be polygraphed, and a waiver of Miranda rights form. During the post-polygraph interview, the defendant admitted to engaging in inappropriate sexual contact with a eight-year old female. The victim was the daughter of an individual that the SUBJECT was sharing a house with in San Jose, California in 1999. The SUBJECT said that on one occasion the victim touched his penis through his pants. On a second occasion, the SUBJECT said that the victim came into his living area, removed her pants and sat on his bed cross-legged. The SUBJECT admitted to touching her vagina during this incident. The SUBJECT also said that he covered the victim with a blanket in the event someone walked in on them. He went on to say that he used a video camera placed under the sheet to view the victim's vagina on a television monitor. He added that after touching her, the victim laid on top of him,

placing her bare vaginal area on top of his penis.  The SUBJECT then said that the victim rubbed his groin until he ejaculated.

72. Based upon your Affiant's previous investigative experience related to child pornography investigations, including investigations of subjects who have distributed child pornography via the Internet that I have been the investigating officer of, your Affiant is aware that individuals who share and distribute child pornography are often child pornography collectors who have escalated their activity from anonymously obtaining free images of child pornography widely available in various locations on the Internet to proactively distributing images they have collected, often for the purposes of trading images of child pornography with others as a method of adding to their own collections. Individuals involved in the distribution of child pornography are also known to continue to obtain free images of child pornography found elsewhere on the Internet, e.g. in Newsgroups and on "free" web sites.

73. Based upon my own knowledge, experience, and training in child exploitation and child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the receipt and collection of child pornography:

    a.  Child pornography collectors may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

    b.  Collectors of child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Child pornography collectors oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

    c.  Collectors of child pornography almost always possess and maintain their "hard copies" of child pornography material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Child pornography collectors typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

    d.  Likewise, collectors of child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the collector to view the collection, which is valued highly.

    e.  Child pornography collectors also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

    f.  Collectors of child pornography prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

74. The undersigned Affiant submits that there is probable cause to believe that an individual found to be utilizing the computer located at the SUBJECT PREMISES is a collector of child pornography. This opinion is based upon the fact that a suspect computer located at the SUBJECT PREMISES has been identified pursuant to this investigation as an instrumentality in the distribution of child pornography, and your Affiant's knowledge and investigative experience related to the habits and tendencies of child pornography distributors. Your Affiant also bases this opinion on his investigative experience gained during the execution of previous search warrants

related to individuals identified as distributors of child pornography in unrelated investigations, namely, that individuals identified as distributors of child pornography have been found to be in possession of massive quantities of child pornography.

75. Finally, based upon the conduct of individuals involved in the collection of child pornography set forth above, namely that they tend to maintain their collections at a secure, private location for long periods of time, there is a probable cause to believe that evidence of the offenses of attempted transportation, receiving, and possessing child pornography is currently located at the SUBJECT PREMISES.

76. Your Affiant knows from training and experience that peace officer(s) or assigned representative(s) should videotape, photograph and/or digital image the location during the execution of this search warrant. The Affiant needs control of who takes the images. Computer(s) at the scene may be operating during the service of the search warrant. The images on the computer screen are transient, it may be necessary to videotape, photograph and/or take a digital image of the computer screen(s). Photographing of the location, vehicles and persons present at the scene is often helpful in the showing possession of the premises and evidence. It is also good to show the condition of the location as the search warrant is served and to show the condition of the location after the search warrant has been served.

## Conclusion

77. Based upon the above information, there is probable cause to believe that the SUBJECT has violated 18 U.S.C. Sections  2252 (a)(2) and (a)(4)(B), which, among other things, make it a federal crime for any person to knowingly possess, receive, or attempt to transport visual depictions of minors engaged in sexually explicit conduct.

/////

/////

/////

12-210822
305A-SC-2496946

78. Based upon the foregoing, this Affiant respectfully requests that this Court issue an
arrest warrant for the SUBJECT.

JAMES WILLIAMS
Special Deputy United States Marshal
Sacramento ICAC Task Force

Approved as to form.

KYLE REARDON
Assistant United States Attorney

Subscribed and sworn to before me
this __19th__ day of November 2012

KENDALL J. NEWMAN
United States Magistrate Judge
Eastern District of California
Sacramento, California